THE STATE v. DAVID, *Appellant*.

Division Two, December 3, 1895.

1. **Criminal Practice**: JURORS: WAIVER. An objection that an improper question was asked of the entire panel on their *voir dire* comes too late when made for the first time on appeal.

2. ———: JURORS, QUALIFICATIONS OF. An inquiry by the court as to whether jurors would be willing to convict on circumstantial evidence alone *held* not a ground for reversal.

State v. David.

3. ———: ———: MURDER. Jurors examined on their *voir dire* who stated they had conscientious scruples against the. infliction of the death penalty, and that they would not render a verdict of guilty knowing that the penalty would be death, were properly excused, though they did not say that their opinion would preclude such a verdict.

4. ———: MURDER: SEPARATION OF WITNESSES: EXPERT WITNESS. The discretion of the court on a murder trial in permitting a witness who was present during the trial to simply compare two signatures, though all the other witnesses were excluded from the court room, will not be disturbed on appeal.

5. ———: ———: COMPARISON OF HANDWRITING: EXPERT WITNESS. The ruling of the court in permitting a comparison of signatures to be made by one who had been engaged in such clerical pursuits, as cashier of a bank and clerk of court, and who testified that he possessed the faculty of distinguishing handwriting, will not be disturbed on appeal.

6. ———: ———: ———: ———. Where it appeared that the evidence taken at the inquest was reduced to writing and the record thereof containing defendant's testimony with his name subscribed thereto was filed with the clerk, as required by law, and by him produced in court and identified and was read in evidence without objection, it is a paper in the case for the purpose of comparing it with a signature to a poison record kept by a druggist and claimed by the state to be defendant's, and the objection to the genuineness of defendant's signature to the inquest comes too late when made for first time in supreme court.

7. ———: ———: INQUEST: EVIDENCE: PRESUMPTION. The testimony of defendant on trial for murder, taken at an inquest, will be presumed to be voluntary in the absence of evidence to the contrary.

8. ———: ———: EVIDENCE. It is competent on a trial for murder for a witness to state how deceased acted at the time he was said to be poisoned.

9. ———: ———: EYEWITNESSES. The trial court may refuse to compel the state to call all the eyewitnesses of the homicide who were before the grand jury and who were in court.

10. ———: ———: "DELIBERATION." On a trial for murder committed by poisoning, deliberation is properly defined to mean "done in a cool state of the blood, and not done in sudden passion engendered by a lawful or just cause of provocation." (*State v. Ellis*, 74 Mo. 208.)

11. ———: ———: "REASONABLE DOUBT." An instruction on reasonable doubt approved.

12. ———: MURDER: MOTIVE: INSTRUCTION. It was not error to instruct the jury, that if defendant committed the murder he was guilty whether a motive for the crime was apparent or not.

State v. David.

13. ———: ———: INSTRUCTIONS. Mere reference in the instructions "to the crime charged in the indictment" after the court has clearly defined the issue, does not constitute error.

14. ———: ———: ———: CIRCUMSTANTIAL EVIDENCE. An instruction on circumstantial evidence that the facts and circumstances tending to prove defendant's guilt must be consistent not only with each other and defendant's guilt, but must be inconsistent with any rational hypothesis of his innocence, was proper.

*Appeal from Osage Circuit Court.*—HON. RUDOLPH HIRZEL, Judge.

AFFIRMED.

*I. W. Boulware* for appellant.

(1) A juror in a murder case is not disqualified by reason of his having "conscientious scruples" against enforcing the death penalty. He may have "conscientious scruples" against many laws in the statute, and yet be a competent juror in a case involving the enforcement of such laws. Only those persons whose opinions are such as to preclude them from finding any defendant guilty of an offense punishable with death are disqualified to serve as jurors on the trial of an indictment for any offense punishable with death. R. S. 1889, sec. 4195. (2) The court erred in sustaining the challenge of the state to jurors who, on their *voir dire* examination, stated that they had formed or expressed an opinion as to the guilt or innocence of defendant based only on newspaper reports or rumors, and not such as to bias or prejudice their minds. R. S. 1889, sec. 4197; *State v. Walton*, 74 Mo. 270; *State v. Bryant*, 93 Mo. 273; *State v. Hopkins*, 84 Mo. 278. (3) The rule adopted by the court below gave the state an endless number of peremptory challenges. Each competent juror discharged on motion of the

state amounted to a peremptory challenge on part of
the state.    Instead of eight challenges as allowed by
law, it had twenty or more.    The jury should consist
of the first forty qualified jurors, and from this forty
the panel of twelve should be selected.    R. S. 1889,
secs. 4202–4205.    (4) This ruling of the court was
erroneous, unjust, improper, and worked to the injury
and prejudice of defendant.    (5) The court erred in
allowing J. R. McCord to testify in behalf of the state,
he being in the court room during the trial, heard all
the witnesses give their testimony. and this in viola-
tion of an order and rule of court made on motion of
the state at the beginning of the trial.    While it may
be in the discretion of the court whether the witnesses
be excluded from the room—separated—yet it was not
in the discretion of the court to permit the rule violated
against the objection of defendant, after being enforced
as to all other witnesses.    *State v. Whitcomb*, 29 S. W.
Rep. (Mo.) 595; *King v. State*, 29 S. W. Rep. (Tex.)
1086; *Mayes v. State*, 24 S. W. Rep. (Tex.) 421;
*People v. Etter*, 45 N. W. Rep. (Mich.) 1109.  (6)
The statements made by parties before the coroner at
the inquest, the verdict of the coroner's jury, and the
other proceedings before the coroner, were illegal and
incompetent testimony, and it was gross and reversible
error to permit the same to go to the jury as evidence
against the defendant.    And, further, there was no
evidence that such statements were made, signed, or
sworn to by the parties.    (The coroner could neither
read nor write.)    *State v. Hope*, 100 Mo. 347; *State v.
O'Connor*, 65 Mo. 374; *State v. Mullins*, 101 Mo. 514;
*Brown v. Connors*, 19 S. E. Rep. (Va.) 447.    (7) There
was no evidence that defendant made or signed the
statement as alleged before the coroner—no jurat or
certificate to same.    No one swore to his signature.
It was not admitted to be genuine, nor was it legally

or properly "a paper in the case." The witness, McCord, was not familiar with his handwriting, never saw him write, nor had he ever seen his signature. (8) If defendant was summoned, sworn, and testified as a witness at the coroner's inquest, such statements so made can not be used as evidence against him on this trial, unless it be shown that he testified of his own volition and not by compulsion. *State v. Mullins*, 101 Mo. 514, and authorities cited; *State v. Wisdom*, 119 Mo. 539; *State v. Young*, 119 Mo. 495; *State v. Same*, 11 S. E. Rep. (S. C.) 292; *People v. Jordan*, 99 Cal. 227. (9) It is the duty of the court to see that innocent men are not convicted of crime. And, therefore, if improper evidence be offered by the state in a criminal case, the court must exclude it whether proper objections be made on part of defendant or not. *State v. O'Connor*, 65 Mo. 374. The court should hesitate long before saying and holding that the violation of a plain rule of evidence did not operate to the prejudice of the accused. *State v. Thomas*, 78 Mo. 327; *State v. Holmes*, 54 Mo. 154. (10) The state's witness, J. R. McCord, was not an expert in handwriting. He did not have the requisite qualifications to make him a competent witness to testify as an expert to the genuineness of a signature by comparison of handwriting. 7 Am. and Eng. Encyclopedia of Law, p. 491, and note; *State v. Tompkins*, 71 Mo. 613; *State v. Owen*, 73 Mo. 440. (11) The trial court was guilty of error in permitting the written statement, alleged to have been made at the coroner's inquest and purporting to be signed by the defendant, Emile David, and the druggist Brandenberger's "poison register" with the signature "E. Davis" thereto, to go to the jury at the request of the state as evidence. There was no evidence that either of the signatures was written by the defendant. *State v. Minton*, 116 Mo. 605–614; Greenleaf on

Evidence, sec. 578; *State v. Scott*, 45 Mo. 302; *State v. Tompkins*, 71 Mo. 614; *Rose v. Bank*, 91 Mo. 399; *State v. Grant*, 74 Mo. 33.   (12) It was the duty of the state to call and examine as witnesses all who were eyewitnesses of the homicide, who were before the grand jury, indorsed on the indictment, and who were present in court.   The prosecuting attorney represented the defendant as well as the state.   It was his duty to produce before the jury all the facts; all the witnesses who had a personal knowledge of the homicide; to see that the guilty are punished and the innocent are protected.   *People v. Gordon*, 40 Mich. 716; *State v. Kilgore*, 70 Mo. 546.   The court is asked to review and reconsider the opinion in case of *State v. Eaton*, 75 Mo. 586; *Mayn v. State*, 24 S. W. Rep. (Tex.) 421; *State v. Etter*, 45 N. W. Rep. (Mich.) 1109.   (13) The court erred in defining the word "deliberation" in the third instruction to mean "done in a cool state of the blood and not done in a sudden passion engendered by a lawful or just cause of provocation."   *State v. Fairlamb*, 121 Mo. 137, and authorities cited.   (14) Instruction number 7, given on part of the state, was not the law.   This instruction told the jury that "if you find that the defendant has committed the crime as charged in the indictment it is your duty to find him guilty, no matter whether any motive for the deed be apparent to you or not."   *State v. Jackson*, 95 Mo. 623; *State v. Sanders*, 106 Mo. 188.   (15) The state's instruction number 7 refers the jury to the indictment to ascertain the issues they were to pass on. *State v. Scott*, 109 Mo. 226; *State v. Brown*, 104 Mo. 365; *State v. McCaskey*, 104 Mo. 644.   (16) No felony can be committed unless done with a criminal intent and motive.   The criminal intent and motive must be proven by direct or circumstantial evidence, or it may

State v. David.

be inferred from other facts proved, yet it is a fact which must be shown to the satisfaction of the jury. 1 Bish. C. L. [4 Ed.], p. 213, sec. 370. (17) Instruction number 6, given on part of the state, in referring to a conviction on circumstantial evidence, tells the jury that before they can find defendant guilty on such evidence the same must be consistent with his guilt and inconsistent with any other theory. This instruction was erroneous. It should have stated that the evidence must be absolutely inconsistent with his guilt. *State v. Moxley*, 102 Mo. 374; *State v. Taylor*, 111 Mo. 538.

*R. F. Walker*, attorney general, and *Morton Jourdan*, assistant attorney general, for the state.

·(1)  The court committed no error in its examination of the jurors on their *voir dire*. (2)  The court did not err in permitting the witness McCord to testify as an expert, as to defendant's handwriting. The evidence showed that defendant had made a statement before the coroner and signed it; it was proper to permit the witness McCord to compare that signature with the one on the poison record. *State v. Minton*, 116 Mo. 614. The witness had qualified as an expert on comparison of handwriting. (3) The court did not err in its instructions on "deliberately" and on "malice aforethought." (4) No error was committed in refusing to compel the state to call all the eyewitnesses of the homicide. (5) The question asked the jurors whether or not they would be willing to find a verdict of murder in the first degree, provided the evidence was sufficient, though entirely circumstantial, was proper. *State v. Young*, 119 Mo. 495; *State v. Leabo*, 89 Mo. 243; *State v. West*, 69 Mo. 401.

GANTT, P. J.—The defendant was indicted and convicted in the circuit court of Osage county at the December term, 1894, of the murder of Frank Henderson by administering to him strychnine in a drink of whisky on the morning of January 8, 1894. From that conviction he prosecuted this appeal.

The testimony discloses the fact that deceased and his parents, during January, 1894, lived in Osage county, about ten miles from Chamois; that the defendant, with his parents, resided in Osage county, between the home of the deceased and Chamois; that on the morning of the eighth of January the deceased started afoot to go to Chamois; that he arrived at the home of the defendant about daylight, where he stopped. Upon his arrival he remarked that he was cold, whereupon defendant invited him to take a drink of whisky, which he did, and almost immediately thereafter was taken with violent cramps and died within an hour and a half. After drinking the whisky the deceased had every symptom of being poisoned. The coroner was sent for, came, attended by two physicians, and made a post-mortem examination, inspected his internal organs, removed the stomach, placed it in a sealed jar, and delivered it to Prof. Chas. S. Sanger, a professor of chemistry in St. Louis. Dr. Mahon, who assisted the coroner in the post-mortem examination, testified that the deceased died from the effects of strychnine poison taken or administered to him. The testimony of Dr. Townley was in substance the same as that of Dr. Mahon. Prof. Sanger testified that he made a chemical examination of the stomach, and found that it contained five sixths of a grain of strychnine, and that this amount was sufficient in quantity to destroy human life.

It was further shown that when the deceased was

taken with the cramps he was sitting by the stove in the kitchen, talking to Miss Lily David, a sister of defendant, with whom he was in love; that he was removed upstairs, and in the presence of the defendant stated that the defendant had given him a drink of white whisky which tasted bitter and left a taste something like quinine in his mouth, which he could not get rid of. One of the state's witnesses, Emmett Crow, testified that sometime prior to the death of Henderson, he had seen a bottle of strychnine in defendant's trunk.

Mr. A. Brandenberger testified that in November prior to the death of Henderson he had sold a quantity of strychnine to some one representing himself to be E. Davis; that he kept a poison record upon which he entered the sale of all poison. His poison record showed the following: "November 1, at 11 A. M., strychnine, one drachm; to kill rats." "Going to use it myself." "E. Davis; residence, Osage county, '93." That he could not identify defendant; that the signature in his poison register was made by the person who bought the poison.

At the coroner's inquest the defendant was sworn and testified, and his evidence was written down by Mr. Giddinhagen, the sheriff of the county. After it was written out it was read over by Giddinhagen to the coroner, who could neither read nor write.

The coroner, as required by law, returned all the evidence taken down, together with the verdict of the jury, to the county clerk, who identified the papers at the trial. After their identification by the county clerk they were offered and read in evidence without objection on the part of defendant. The testimony of each witness as taken at the inquest purported to be signed by himself. The name of defendant was appended to his evidence thus returned. No objection was made

because the signatures had not been first proven or for any other reason whatever.

J. Rhey McCord, Esq., was sworn as an expert and testified that in his opinion the signature to the defendant's evidence before the coroner was written by the same person who signed the poison record kept by the pharmacist, Mr. Brandenberger.

The testimony on the part of the defendant tended to establish a good reputation for the defendant and a bad reputation for the state's witness, Emmett Crow.

It is also shown by the defendant that he was in Jefferson City on the first of November, the same date on which the strychnine was sold by Mr. Brandenberger. The David family testify that the deceased stated that he had taken a drink of whisky given by defendant out of a white, druggy bottle, and Mrs. O'Doud testified that just before the death of Henderson, and while he was sick, she took a drink of whisky out of a white bottle, which was said to be of the same whisky given to deceased. It is also shown that the deceased was in love with Lily David. She testified that while her father objected to the attentions of the deceased, the defendant did not. She also testified that she had frequently been in the trunk of the defendant, had seen tools, bottles of musk and perfumery, but she does not say that she did not see strychnine as testified to by Crow.

The defendant testified in his own behalf; denied that he purchased the poison as shown by Brandenberger's register; does not remember the dates of his visits to Jefferson City; admits having given the deceased a drink of whisky, but says there was nothing in the bottle but whisky; says that he and his father and Mrs. O'Doud took a drink out of the same bottle after deceased became sick; denies that he had any

strychnine in his trunk, and testifies that he and the deceased were good friends.

It also appears from the testimony that while the deceased was sick he was given a drink of red whisky which was secured, not out of a white bottle, but out of a jug downstairs, and given in a tin cup.   Other facts may appear in the course of the opinion.

I.   The court asked the entire panel on their *voir dire* examination if they would find a verdict of murder in the first degree upon circumstantial evidence if it was sufficient, premising that he understood the state would perhaps not be able to prove by direct testimony who did the poisoning or mixing the poison administered to Frank Henderson.   It is now for the first time objected that this question was improper in that it assumed that Henderson was poisoned.   The exception comes too late; but if it had been timely, in view of the overwhelming testimony that Henderson was poisoned the judgment would not be reversed for this reference alone.

Several of the jurors also stated they had conscientious scruples against the infliction of the death penalty; that they could not, and would not, render a verdict of guilty knowing the penalty would be death. Much stress is laid upon the form of the question and the answer that they did not say their opinions would *preclude* such a verdict.   The whole examination disclosed very clearly that such was their conviction and no error was committed in excluding these jurors.

Equally untenable is the point now urged to the exclusion of other jurors because their opinions were formed merely from rumors and newspaper reports. The record does not sustain this assignment.   The court seems to have been very patient and careful to obtain an impartial jury.

II.  The objection to the ruling permitting J. Rhey McCord to testify because he had been in the court room during the trial is without merit.  The record does not show any order excluding the witnesses, and if it did, the discretion of the trial court will not be interfered with because it made this exception.  Mr. McCord was called simply to compare two signatures and if he had heard all the evidence it would not have aided him in forming his opinion as an expert on handwriting.  *State v. Whitworth*, 126 Mo. 573.

Neither do we consider he was incompetent to testify as an expert.  His qualification was a preliminary question for the determination of the circuit court.  It appeared that the larger portion of his life had been devoted to clerical pursuits such as cashier of a bank, clerk of the court for eight years, deputy collector of taxes, and prosecuting attorney.  The witness himself felt that he had a peculiar faculty in distinguishing handwriting.  Nothing whatever appeared to the contrary.  The decision of the trial court will not be disturbed under such circumstances.

The most serious and important question in this record, however, does arise in connection with Mr. McCord's testimony.  He was called upon to compare the signature to the evidence of the defendant taken at the coroner's inquest with the signature to the poison record kept by the druggist, Mr. Brandenberger.  When the two signatures were shown to the witness for comparison, counsel for defendant inquired what the papers were which purported to be signed by defendant and was answered that it was the record in the case.  The counsel then objected in these words: "We object.  It is not a paper in this case; you can't compare one paper with another, unless the paper is a paper of this case.  We hold that the witness can't tes-

tify as to the genuineness of this book by comparison with a paper that is not in this case." To this the prosecuting attorney answered, "The paper is in evidence and I want Mr. McCord to look at these signatures and by comparing them say whose they are." "Objection for irrelevancy and incompetency." Objection overruled and exception saved. For a correct understanding of the exception it will be necessary to revert to the introduction of the sworn statement made by defendant before the coroner.

The coroner, Mahon, was sworn, and testified to having held an inquest over the dead body; that the witnesses and jurors were all sworn, and the evidence written down by Giddinhagen, the sheriff. He was asked by counsel for defendant if he made a record of it and he answered he did and made a report of it to the county clerk; filed it with the clerk. The county clerk was sworn, and identified the papers as those filed with him by the coroner. Among these papers was the following:

"Testimony of Emile David.

"The first I saw of Mr. Henderson was in our yard and he said, 'I am cold, let me go in the house and warm.' I asked him if a dram of whisky would help him. He said yes, he thought it would. I then gave him a dram of whisky. After I gave him the whisky, he opened the door and came in the house. I did not say *white* whisky, but said whisky in a white bottle. No one saw me give Henderson the dram of whisky.

(Signed)                      "EMILE DAVID."

No objection whatever was made to the introduction of this deposition separately, or to the whole inquest in a body.

That it was a paper, then, in the case there can be no doubt. Section 2451, Revised Statutes, 1889, requires that "the evidence of such witnesses shall be taken

down in writing and subscribed by them.'' In addition to the positive testimony of the coroner, received without objection, to the effect that all the witnesses were duly sworn and their testimony reduced to writing and returned by him to the county clerk, and that of the county clerk identifying the papers, the law presumes the coroner did his duty and returned the deposition of each witness *duly subscribed* as required by law. Certainly there is no presumption that the coroner signed defendant's name to his evidence without authority. This presumption in favor of the correctness of official action has often been indulged by this court. *Owen v. Baker*, 101 Mo. 407; *State ex rel. v. Mastin*, 103 Mo. 508; *Mitchner v. Holmes*, 117 Mo. 185; *State v. Lord*, 118 Mo. 1; *State v. Howard*, 118 Mo. 127.

Moreover, defendant must be held, in the absence of objection of any kind to his sworn statement when it was offered in the circuit court, to have waived any proof of the genuineness of his signature. The paper was offered as a whole. *His signature was a part of the deposition.* It was competent as an admission of his, and if it was not his genuine signature, it was his duty then and there to object to it. *Bartlett v. O'Donoghue* 72 Mo. 563. It was competent for him to waive further proof of his signature, and, having elected to do so then, it is too late to raise that question now. *Miles v. Loomis*, 75 N. Y. 288.

The principle we are invoking is aptly illustrated by the case of a deposition offered on a trial without having previously accounted for the nonproduction of the witness by reason of his absence at the requisite distance from the place of trial. In such a case, if objection be not made to the deposition when offered, it will not meet with favor afterward.

Again, a party has a right to demand that a witness shall be sworn before testifying, but suppose he

knowingly permits a witness to testify, and raises no objection until he reaches this court, certainly he would not be permitted to raise that objection here on appeal, for the first time.

Had the defendant objected that his signature had not been sufficiently proven, the state would have been required to prove it, and doubtless could have called the coroner, or sheriff, or others, who saw him sign the writing purporting to be his evidence. It stood as an admission, and there was no error in permitting the expert to compare it with the signature to the poison record—in the then state of the evidence. *Miles v. Loomis, supra; Shaw v. Bryant,* 35 N. Y. Supp. 909.

III. Again, it is assigned for error that defendant was summoned, sworn, and testified as a witness at the coroner's inquest, and it was error to admit his evidence taken at the inquest against him.

There is nothing to indicate that defendant was subpoenaed, nor that his testimony was not entirely voluntary. It is certain that he went to Chamois and urged and insisted upon the coroner coming to hold the inquest. His testimony appears in a narrative form, without question or answer. The facts bring his case within the rule laid down in *State v. Mullins,* 101 Mo. 514, in which it was held that, in the absence of proof to the contrary, his statement will be presumed to have been voluntary. The case is lacking in all the essentials which induced the ruling in *State v. Young,* 119 Mo. 495.

IV. The record does not support the fourteenth assignment of error. Counsel did not ask to recall Mr. Brandenberger. He did not advise the court of the question he claimed to have overlooked, and saved no exception to the court's alleged refusal to permit a further cross-examination of the witness.

V. No reason was assigned for objecting to Crow's

evidence, in answer to the question: "What seemed to be the matter with Henderson?" It was perfectly competent for him to state the evidences of suffering and pain that he observed. He had already testified that the deceased was stooped over with cramps, and was holding to the bed rail as if in extreme agony; that he had brought him hot coffee; that he could not drink it, and was asked, "what seemed to be the trouble?" and he answered merely that "he seemed like he couldn't raise himself up far enough to swallow, looked like his nerves and everything was strained." "He could not swallow."

VI. The point is again made that the court refused to compel the state to call all the eyewitnesses of the homicide who were before the grand jury, and who were in court. For the reasons assigned in *State v. Eaton*, 75 Mo. 594, no error was committed by the court in declining to make the order requested. *State v. Harlan*, 130 Mo. 381; *Mayes v. State*, 24 S. W Rep. (Tex.) 421.

VII. There was no error in defining deliberation. There is not a semblance of provocation in the case, of any kind, and this instruction was approved in *State v. Ellis*, 74 Mo. 208, under such circumstances. It differs from the instruction in the *Fairlamb* case (121 Mo. 137), in that it defines the condition of the mind when the crime was committed, that is to say, *the act* was "*done* in a cool state of the blood," whereas in the *Fairlamb* case it was said "deliberation" meant "a cool state of the blood," having no reference, whatever, to the state of mind, but relating wholly to the physical condition of the blood.

VIII. The fifth instruction correctly defined reasonable doubt; and was as favorable to defendant as the law would permit. It is entirely different from the instruction condemned in *State v. Shaeffer*, 89 Mo. 271.

IX.   Defendant complains of the seventh instruction given by the court of its own motion, as follows:

"The previous good character of the defendant is a proper matter for the consideration of the jury, like any other fact proven in the case.   If, however, you are satisfied, beyond a reasonable doubt, from all the facts and circumstances proven in the case, that the defendant is guilty of the crime as charged in the indictment, then it is your duty to find the defendant guilty, even though you may be satisfied from the evidence that the defendant sustained a good character and reputation previous to, and up to, the time of the commission of the crime charged.   And if you find that the defendant has committed the crime as charged in the indictment, it is your duty to find him guilty, no matter whether any motive for the deed be apparent to you or not."

In connection with this instruction at the instance of defendant the court instructed the jury as follows:

"The court instructs the jury that when the evidence fails to show any motive to commit the crime charged on part of defendant, this is a circumstance in favor of his innocence and in this case if the jury finds upon a careful examination of all the evidence that it fails to show any motive on the part of defendant to commit the crime charged against him then this is a circumstance which the jury ought to consider in connection with all the evidence in the case in making up their verdict.   And in order to ascertain a motive the jury will take into consideration all the evidence in reference to their associations, relations, and deportment toward each other, together with all the other evidence in the case."

There was no error in instructing the jury that if they believed from the evidence that defendant committed the murder it was their duty to find him guilty

whether the motive for the crime was apparent to them or not.    The learned counsel has not in oral argument or his printed brief essayed to point out the error, and we can only infer that he is of opinion that no defendant can be convicted of a crime for the commission of which no motive is proven or made apparent to the jury.

This, however, is clearly not the law.    It seems to be a confusion of the necessary "intent" with "motive." The distinction is clear.    It devolves upon the state to show the intent.    If the jury believed, as they have said by their verdict they did, that defendant knowingly and willfully gave the deceased a drink of whisky with sufficient strychnine in it to kill him they were bound to find that he intended the natural consequence of his act, to wit, death by poison; but can it be maintained that, though they found he accomplished the death of his victim by this intentional act, it was no crime, because, forsooth, they could not discern the motive therefor?    The motives for crime are so numerous, so hidden, and often so utterly unreasonable, that it is impracticable to require that they shall always be made manifest.

The fact of motive or the absence of motive is always an important inquiry in a case of this character, but the absence of an apparent motive is not conclusive of the innocence of the defendant.    As stated by the learned circuit court, it is a circumstance in favor of the prisoner but this is the extent of the weight to be given it.    The court would not have been justified in directing a verdict for the defendant unless the jury could find a rational motive therefor.    The counsel for the defendant did not ask for such an instruction and if he had it should have been refused. The two instructions are entirely consistent and defendant had the full benefit of the want of an apparent

motive on his part for the murder of the deceased. It did not follow that there was no motive because none appeared or that a murder is impossible because there is no motive for it. / *State v. Coleman*, 20 S. C. 441; *People v. Ah Fung*, 17 Cal. 377; *Clifton v. State*, 73 Ala. 473; *State v. Preston*, 8 Tex. App. 30; *State v. Green*, 38 Ark. 304; *McLain v. Com.*, 99 Pa. St. 86.

Again, it is urged against this instruction that it referred the jury to the indictment to find the issues they were to pass upon. As was said in this court in *State v. Scott*, 109 Mo. 226, "the jury should not be referred to the pleadings in civil, or the indictment in criminal, cases to ascertain the issue." But mere reference to the indictment by the words "as charged in the indictment" or "as mentioned in the indictment," after the court has once clearly defined the issues, does not constitute error.

In this case the court had fully defined the essentials of the crime charged, which was simply that defendant had murdered Henderson, the deceased, by administering to him strychnine. The mere reference by the court and counsel for the state in these instructions to "the crime charged in the indictment" could not have been prejudicial. Counsel for defendant uses the same phraseology in his own instruction in the same connection. *Britton v. St. Louis*, 120 Mo. 437; *Edelmann v. Transfer Co.*, 3 Mo. App. 503; *Corrister v. Railroad*, 25 Mo. App. 619.

X. There was no error in the sixth instruction given for the state on the subject of circumstantial evidence. The jury were required to find the guilt of defendant beyond a reasonable doubt, and that the facts and circumstances tending to prove his guilt were not only consistent with each other and the guilt of the defendant but they were told the proven facts must be inconsistent with any rational hypothesis consistent

with his innocence. It substantially conforms to the opinion of this court in *State v. Moxley*, 102 Mo. 374; *State v. Woolard*, 111 Mo. 248.

XI. There was no error in refusing the seventeenth instruction asked by defendant. The court had in the ninth instruction explained the status of defendant as a witness under our statutes and the instruction asked was but a reiteration of the eighth instruction given for the state. Nor was any error committed in refusing the other eleven instructions prayed by defendant. In the eighteen instructions given, nine on behalf of the state and nine for defendant, the court fully and fairly declared the law. Indeed, it might well have dispensed with a number of those it gave without infringing any right of the defendant.

Upon a careful review of the evidence and the rulings of the court we have been unable to find any substantial error in the trial, and it only remains for us to affirm the judgment of the circuit court and direct that the sentence of the law be executed. SHERWOOD and BURGESS, JJ., concur.